UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
       )
         v.               )     No. 01 CR 634
       )     Judge Charles R. Norgle, Sr.
JAMES JACKSON       )
MARIA JACKSON      )
DAWN JACKSON       )

NOTICE OF FILING

TO:    Vincent R. Jones                 Paul Brayman
       407 S. Dearborn Street, Suite 1260     727 S. Dearborn Street, Suite 712
       Chicago, IL 60605                Chicago, IL 60605

      PLEASE TAKE NOTICE that on August 19, 2002, the undersigned filed with the Clerk of
this Court, the following document in the above captioned case: **GOVERNMENT'S SANTIAGO
PROFFER REGARDING ADMISSION OF CO-CONSPIRATOR STATEMENTS** service of which
is being made upon you.

                           Respectfully submitted,

                           PATRICK J. FITZGERALD
                           United States Attorney

       By:     *Brian R. Havey*
                     BRIAN R. HAVEY
                     Assistant United States Attorney
                     219 S. Dearborn, Room 500
                     Chicago, IL 60604
                     (312) 886-2065

STATE OF ILLINOIS      )
                     ) SS
COUNTY OF COOK      )

      Mia F. McDowell, being duly sworn on oath, deposes and says that she is employed in the
Office of the United States Attorney for the Northern District of Illinois; and that on the 19th day of
August, 2002, she caused a copy of the above-mentioned notice to be hand-delivered to the
individuals(s) named above.

                     *Mia F McDowell*

                     SUBSCRIBED and SWORN to before me
                     this 19th day of August, 2002

                     *Peggy M. Zabinski*
                     NOTARY PUBLIC

"OFFICIAL SEAL"
Peggy M. Zabinski
Notary Public, State of Illinois
My Commission Exp. 06/04/2006

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
  )
v. )  No. 01 CR 634
  )
JAMES JACKSON )  Judge Charles R. Norgle, Sr.
MARIA JACKSON )
DAWN JACKSON )

*FILED*
*AUG 1 9 2002*
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

*DOCKETED*
*AUG 2 0 2002*

GOVERNMENT'S SANTIAGO PROFFER REGARDING
ADMISSION OF CO-CONSPIRATOR STATEMENTS

The UNITED STATES OF AMERICA, by its attorney, PATRICK J.
FITZGERALD, United States Attorney for the Northern District of
Illinois, respectfully submits the following proffer of evidence as
to the admission of co-conspirator statements against defendants
JAMES JACKSON, MARIA JACKSON, and DAWN JACKSON.

The defendants are named in a two-count indictment. Count One
charges them with conspiracy to distribute and possess with intent
to distribute cocaine, in violation of 21 U.S.C. § 846. Count Two
charges them with possession with intent to distribute cocaine, in
violation of 21 U.S.C. § 841(a)(1).

In its case-in-chief, the government intends to introduce
various statements which were made by the defendants to individuals
who were cooperating with the government, as well as statements
made to law enforcement agents. As explained in more detail below,
such statements are admissible pursuant to Federal Rule of Evidence
801(d)(2)(A) as admissions by a party-opponent, and pursuant to
Rule 801(d)(2)(E) as co-conspirator statements.

I.   GOVERNING LAW

A.   Rule 801(d)(2)(E)

Rule 801 provides in part that "[a] statement is not hearsay" if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Admission of a co-conspirator statement is proper when the government establishes, by a preponderance of the evidence, that:  (1) a conspiracy existed; (2) the defendant and the declarant were members of that particular conspiracy; and (3) the statement was made during the course of and in furtherance of the conspiracy.  See Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Santiago, 582 F.2d 1128, 1134 (7th Cir. 1978).  In this Circuit, the preferred way for the government to make its preliminary factual showing is through the filing of a pretrial written proffer of the government's evidence. United States v. Boucher, 796 F.2d 972, 974 (7th Cir. 1986); United States v. Hooks, 848 F.2d 785, 794-95 (7th Cir. 1988).

(1)   Membership in a Conspiracy

The principles of general conspiracy law apply to Rule 801(d)(2)(E) inquiries regarding the existence of a conspiracy and a defendant's membership in it.  Thus, the government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy.  United States v. Liefer, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); United States

2

v. Towers, 775 F.2d 184, 189 (7th Cir. 1985). A defendant's membership in a conspiracy may be proved by circumstantial evidence alone: "[b]ecause of the secretive character of conspiracies, direct evidence is elusive, and hence the existence of the conspiracy and the defendant's participation can usually be established only by circumstantial evidence." United States v. Redwine, 715 F.2d 315, 319 (7th Cir. 1983), cert. denied, 467 U.S. 1216 (1984). A single act or conversation can "suffice to connect the defendant to the conspiracy if that act leads to the reasonable inference of intent to participate in an unlawful enterprise." United States v. Baskes, 687 F.2d 165, 169 (7th Cir. 1981). A trial court also may consider the proffered co-conspirator statement itself in determining whether a conspiracy existed and whether the defendant participated in it. See Fed. R. Evid. 801(d)(2); Bourjaily, 483 U.S. at 180-81; United States v. de Ortiz, 907 F.2d 629, 631-35 (7th Cir. 1990) (en banc); United States v. Zambrana, 841 F.2d 1320, 1344-45 (7th Cir. 1988) (overall context of co-conspirator statements makes statements reliable as evidence of defendant's role in conspiracy).

It is also well-established that "statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive to join a going concern." United States v. Potts, 840 F.2d 368, 372 (7th Cir. 1987) (citing cases). "Conversations made by conspirators to

3

prospective coconspirators for membership purposes are acts in furtherance of the conspiracy." United States v. Shoffner, 826 F.2d 619, 628 (7th Cir.), cert. denied, 484 U.S. 958 (1987) (quoting and citing cases). Similarly, a conspirator who has become less active in the conspiracy nevertheless is liable for his co-conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. United States v. Feldman, 825 F.2d 124, 129 (7th Cir. 1987); United States v. Andrus, 775 F.2d 825, 850 (7th Cir. 1985).

(2) Statements "In Furtherance" of a Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. Shoffner, 826 F.2d at 628; United States v. Mackey, 571 F.2d 376, 383 (7th Cir. 1978). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be in furtherance of the conspiracy; the statement need not have been made exclusively, or even primarily, to further the conspiracy in order to be admissible. Shoffner, 826 F.2d at 628.

In general, statements that are "part of the information flow between conspirators intended to help each perform his role" are statements in furtherance of the conspiracy. United States v. Van Daal Wyk, 840 F.2d 494, 499 (7th Cir. 1988). Likewise, assurances that a co-conspirator can be trusted or relied upon to perform his

4

role are considered to further the conspiracy. <u>United States v. Buishas</u>, 791 F.2d 1310, 1315 (7th Cir. 1986). Statements designed to conceal a conspiracy also are deemed to be in furtherance of the conspiracy where ongoing concealment is a purpose of the conspiracy. <u>Mackey</u>, 571 F.2d at 383; <u>United States v. Kaden</u>, 819 F.2d 813, 820 (7th Cir. 1987).

Just as a co-conspirator statement may be used by the court to determine membership in a conspiracy, so too may it be used in determining whether the offered statement was made in furtherance of the conspiracy. <u>See</u> Fed. R. Evid. 801(d)(2); <u>de Ortiz</u>, 907 F.2d at 631-35; <u>Shoffner</u>, 826 F.2d at 628; <u>United States v. Xheka</u>, 704 F.2d 974, 976 (7th Cir.), <u>cert. denied</u>, 464 U.S. 993 (1983). The question of whether a statement was in furtherance of the conspiracy depends, of course, upon the particular factual context in which the statement was made. Nevertheless, certain types of statements routinely appear in conspiracy cases and the Seventh Circuit has repeatedly upheld their admission. Among the types of statements that have been approved as being in furtherance of conspiracies are the following: "recruiting" statements, <u>Shoffner</u>, 826 F.2d at 628 (quoting and citing prior authorities); updates on a conspiracy's progress, <u>Potts</u>, 840 F.2d at 371; statements about prior criminal activities used to establish trust between conspirators, <u>United States v. Sophie</u>, 900 F.2d 1064, 1073-74 (7th Cir.), <u>cert. denied</u>, 498 U.S. 843 (1990); and conversations

5

concerning planning or review of co-conspirators' exploits, United States v. Molt, 772 F.2d 366, 368-69 (7th Cir. 1985), cert. denied, 475 U.S. 1081 (1986). It is immaterial that statements otherwise in furtherance of the conspiracy were made to a government witness or agent. United States v. Mealy, 851 F.2d 890, 901 (7th Cir. 1988).

>    B.    Admission of Statements Without Regard to the
>          Co-Conspirator Statement Rule.

A defendant's own admissions are obviously and powerfully relevant in establishing the factual predicates for the admission of statements by co-conspirators against him. See Potts, 840 F.2d at 371-72. However, statements by a defendant are admissible against that defendant pursuant to Rule 801(d)(2)(A) without regard to the co-conspirator statement rule. See Shoffner, 826 F.2d at 626-27 & n.10.

Nor is the co-conspirator statement rule implicated when the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, when the "statement" is not an "assertion" subject to verification (an example being a declaration that is simply an order or a suggestion). See United States v. Tuchow, 768 F.2d 855, 868 n.18 (7th Cir. 1985). More importantly, the co-conspirator statement rule is not implicated if a statement is not offered in evidence to prove the truth of the matter asserted and thus does not constitute "hearsay" as defined by Rule 801(c). Therefore, co-conspirator statements may be admitted against a

6

defendant, without establishing the <u>Bourjaily</u> factual predicates, but with corresponding limiting instructions, where such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. <u>United States v. Herrera-Medina</u>, 853 F.2d 564, 565-66 (7th Cir. 1988); <u>Van Daal Wyk</u>, 840 F.2d at 497-98; <u>Tuchow</u>, 768 F.2d at 867-69; <u>United States v. Magnus</u>, 743 F.2d 517, 521-23 (7th Cir. 1984).

    C.   <u>Sixth Amendment Issues</u>

Separate Sixth Amendment "confrontation" issues are sometimes posed at a joint trial by the use of a nontestifying co-defendant's "powerfully incriminating" statements admitted for the truth of the matter asserted. <u>See</u> <u>Bruton v. United States</u>, 391 U.S. 123, 135-37 (1968) (co-defendant's post-arrest confession effectively naming the defendant). But "the requirements for admission under Rule 801(d)(2)(E) are identical to the requirements of the Confrontation Clause," so there is "no constitutional problem" once the Rule's requirements are met. <u>Bourjaily</u>, 483 U.S. at 182. Thus, in weighing the admissibility of co-conspirator statements, the trial court does not consider whether the co-conspirator/declarant is "unavailable," <u>United States v. Inadi</u>, 475 U.S. 387, 400 (1986), or engage in an independent inquiry into the "reliability" of the proffered statements. <u>Bourjaily</u>, 483 U.S. at 183-84. Under <u>Bourjaily</u>, if the requirements of Rule 801(d)(2)(E) have been satisfied, the requirements of the Confrontation Clause also have

7

been satisfied.

## II.   DISCUSSION

As stated above, JAMES JACKSON, MARIA JACKSON, and DAWN JACKSON have been charged with one count of conspiracy to distribute and possess with intent to distribute cocaine, and with one count of possession with intent to distribute cocaine.   The charges stem from their participation in a conspiracy to distribute five kilograms of cocaine to an individual who, unbeknownst to them, was cooperating with the government (hereinafter referred to as "the CI").   At trial, the government intends to establish this conspiracy through the testimony of the CI, who had a number of conversations with the defendants during the investigation.   The CI successfully recorded most, though not all, of his conversations with the defendants.   The CI's testimony will be corroborated by the audiotapes of his conversations with the defendants and by testimony from law enforcement agents who conducted surveillance during the investigation.

The following discussion contains a summary of the various acts committed by the defendants and statements made by them during, and in furtherance of, the conspiracy.   This discussion is not intended to be an exhaustive description of the evidence to be adduced at trial.   Nonetheless, with regard to any co-conspirator statements described below, the following summary satisfies the

8

standards governing the admission of co-conspirator statements.[1]

A.   Background

Prior to his cooperation with the government, the CI himself had been the target of a narcotics investigation.   The CI had operated a trucking company in Dolton, Illinois, which he used in part to facilitate a cocaine trafficking operation.   In November 2000, the CI was arrested after one of his truck drivers delivered a load of approximately twenty-five kilograms of cocaine from Texas to the CI's trucking company.   Following his arrest, the CI began cooperating with the government in investigations of other narcotics traffickers.

In about the Spring of 2001, the CI informed the government that he had received information from an acquaintance that the JACKSONS were possibly involved in narcotics activity.   The CI's acquaintance, who had known the JACKSONS for many years, agreed to make an introduction to the JACKSONS.[2]

The CI's acquaintance (hereinafter referred to as "CI2") subsequently introduced the CI as a potential investor in a comedy

---

[1] Many of the statements summarized below are taken from draft transcripts of recorded conversations.   Those draft transcripts have been provided to defense counsel.   Final versions of the transcripts which the government intends to use at trial will be prepared and provided to the defense prior to trial.

[2] JAMES, MARIA, and DAWN JACKSON are related to one another (JAMES and MARIA are married; DAWN is JAMES's sister).   For the sake of simplicity and to avoid confusion, the government hereinafter shall refer to each defendant by his/her first name.

club business which DAWN and MARIA were opening in Lansing,
Illinois, known as the "TNT Comedy Club." The CI was also
portrayed to the JACKSONS as a drug dealer who was looking for a
new source for cocaine. Over the course of several weeks in June
and July 2001, the CI discussed a possible drug and money
laundering venture with MARIA and DAWN, culminating in a five-
kilogram cocaine deal which led to the charges in this case.

B.    The CI's Discussions with the Defendants

On June 18, 2001, the CI went with CI2 to the JACKSONS'
residence in South Holland, Illinois, to meet with MARIA. During
that meeting, which the CI recorded, the CI asked MARIA if she was
in a position to connect him with someone who could supply some
cocaine. Transcript ("Tr.") at 1 (CI: "What I'm looking for, he
said you might have somebody give me some keys"). MARIA indicated
that she would be able to do so. When asked about prices, MARIA
said that she had a source who would be able to supply cocaine at
a price of $15,000 per kilogram. Id. at 2 (CI: "What kind of
prices are they talking about?" MARIA: "They can ...if...one guy
knows he is probably going to go fifteen."). When the CI then
asked if she had dealt with this cocaine source before and how much
cocaine he could supply, MARIA responded that he had twenty
kilograms a month ago. Id. at 3 (CI: "You guys buy from him
before?" MARIA: "Yes...about a month ago." CI: "What kind of
weight?" MARIA: "...twenty."). The CI told MARIA that he always

10

liked to buy one or two kilograms at first to make sure they were of good quality, and that he wanted to go through MARIA to do the deal.  MARIA responded, "that's alright.  That's the way he would want it."  Id. at 4.  The CI and MARIA agree to talk again later.

On June 28, 2001, the CI met with DAWN at the TNT Comedy Club to further discuss their potential drug venture.  The CI asked DAWN if MARIA was coming to the meeting, and DAWN said that she would be there in about fifteen minutes.  During this meeting, which the CI also recorded, the CI asked DAWN if CI2 had talked to her about the CI's interest in purchasing some cocaine.  DAWN said no, but that MARIA had talked to her about it.  DAWN stated that she had a good friend who was a cocaine source.  The CI asked DAWN if her source could deliver a large quantity of cocaine ("do he handle weight?" Tr. at 2), and DAWN responded that her source could supply the CI with as much cocaine as he needed ("there is no limit to what you need that he couldn't do," id.).  At one point, the CI mentioned that MARIA was checking with her cocaine source, and DAWN stated that she and MARIA had the same source.  DAWN reiterated that "he can get whatever you need."  Id. at 20.  The CI told DAWN to tell her source that if the price was right, he would buy 50-100 kilograms a month.  DAWN said okay.  DAWN indicated that she was going to talk with her cocaine source that day and that the CI should call her back later.

Later that evening, the CI called DAWN, but she apparently had

11

not yet met with her cocaine source and had no more information for the CI. They agreed to talk later.

At one point during June 2001, the CI received a call from DAWN, who stated that she had to see the CI right away. The CI agreed to meet her at a truck stop on 159th Street and I-94. The CI then drove to the truck stop, and met with DAWN in the parking lot. MARIA was with DAWN. DAWN proceeded to tell the CI that her friend (her cocaine connection) had told her to forget about doing a drug deal with the CI because the CI may be cooperating with the government. DAWN said that her source had told her that there was a truck driver from Dolton who was working with the DEA and setting up people, and that he (DAWN's source) was very cautious and was leery of the CI.

During this conversation, the CI was able to convince DAWN that he was not a government informant. Satisfied that the CI was not an informant, DAWN told the CI that she and MARIA were then on their way to meet with an individual to whom they had to give a check and that they would talk to that individual about doing a drug deal with the CI. DAWN stated that they would get back to the CI.

On July 2, 2001, the CI called MARIA to inquire about the status of her cocaine source. MARIA indicated that her source was reluctant to deal with anyone new. She further stated that her source would be out of town until Sunday, but that she would keep

12

trying, and would let the CI know what he said after she talked to
him again.

That evening, the CI called DAWN, and made arrangements to
meet with her to discuss the situation further.  They agreed to
meet in the parking lot of a supermarket in South Holland.  MARIA
came to the meeting with DAWN.  After they arrived and parked their
vehicle, DAWN and MARIA got into the CI's vehicle.  In the ensuing
meeting, DAWN told the CI that their cocaine sources ("connects")
were legitimate, but that one of their sources was reluctant to
deal with the CI because he didn't know the CI and because the CI
was seeking such large quantities of cocaine.  When the CI asked
what they had said to their source about how much cocaine he
wanted, DAWN responded, "[w]e told him we was going to start off
with ten [kilograms], and we was looking to do fifty to a hundred
[kilograms] a month."  Tr. at 2.  DAWN indicated that their other
source was also hesitant about dealing with someone new.  DAWN
further indicated that their sources did not want to meet with the
CI.  MARIA added that she and DAWN were still trying to convince
their sources that "everything is straight."  Id. at 8.  MARIA
further stated that she had another source that she was going to
check with.  When the CI asked if any of their sources had quoted
prices for the cocaine, DAWN stated that they would charge about
$20,000-$21,000 per kilogram.  She indicated that the prices would
get better after the first deal.

13

During this conversation, the CI also asked DAWN and MARIA if they could launder five hundred thousand dollars in drug money for two other individuals with whom he was acquainted. DAWN and MARIA indicated that they could, describing different ways of laundering the money, such as by running the money through the TNT Comedy Club, arranging shows at other places, or conducting real estate transactions. DAWN told the CI that it would take about ninety days for them to launder $300,000 ("[w]e can do three in ninety days," id. at 14).[3]

At the conclusion of the meeting, DAWN and MARIA indicated they would keep trying to find a cocaine source for the CI.

On July 3, 2001, JAMES called CI2 and left him a voicemail message. JAMES stated that "[his] guy" had just called him and wanted to know if CI2 was "serious" (about the drug venture proposed by the CI). JAMES stated, "[s]o if you're serious, get up with me so I can let you know what is going on so I can call him

---

[3] These statements (and others referred to below) regarding money laundering are not only admissible as co-conspirator statements, they are admissible, alternatively, under Rule 404(b) for purposes of establishing the defendants' intent, knowledge, and plan to commit the offenses charged in the indictment. See, e.g., United States v. Best, 250 F.3d 1084, 1091 (7th Cir.) ("[w]e have repeatedly held that when a defendant is charged with a specific intent crime, the government may introduce evidence of other acts to prove intent"), cert. denied, 122 S. Ct. 279 (2001). In addition, such statements are relevant to any entrapment defense that the defendants may assert at trial. See Mathews v. United States, 485 U.S. 58, 63 (1988) ("[p]redisposition, the principal element in the defense of entrapment, focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime") (internal quotation marks and citations omitted).

14

and let him know what is going on."

Two days later, on July 5, 2001, the CI called DAWN to see if she had made any progress in locating a cocaine source who was willing to deal with the CI. DAWN indicated that she had talked to two more people, but that they too were hesitant about dealing with the CI and were asking the same questions about him. The CI told DAWN to tell them that he just wanted to buy five kilograms of cocaine to start with, and then he could buy more once they got to know him. The CI stated that he would check back with her the following Monday.

On July 7, 2001, the CI had a telephone conversation with MARIA, during which she indicated that they had located a source who had five kilograms of cocaine to sell, at a price of $20,000 per kilogram. The CI responded that that price was good and that MARIA should go ahead set up a deal.

By July 9, 2001, the deal still had not been arranged. The CI called DAWN and told her that he would buy the five kilograms of cocaine that MARIA had previously mentioned, together with whatever cocaine DAWN's source had available. The CI then asked DAWN if she still would be able to launder the money that they had previously talked about, and she responded, "[i]f he give me ninety days, yeah." Tr. at 2. The CI told DAWN that he wanted to do the deal that evening if possible. DAWN said that she was getting ready to go to MARIA's house and that the CI should call her in about forty-

15

five minutes. When asked, DAWN said that she didn't know yet where the deal was going to take place. DAWN stated that she would let the CI know as soon as she talked to MARIA. The CI then said that he would call her back in about an hour.

About an hour later, the CI called MARIA and asked if they were still going through with the deal because they seemed to be having problems. MARIA indicated that the problems stemmed from the fact that the CI had previously stated that he had to be present for the deal, yet her sources did not want to meet him. The CI emphasized that he had to be present in order to see what he was buying. MARIA then suggested that they give him a sample of the cocaine first. The CI asked how he would know that it would be a legitimate sample, and MARIA responded, "I can guaranty that." Tr. at 3. The CI reiterated, "I just want to make sure I'm getting what I'm paying for." Id. at 4. MARIA assured the CI that the problem didn't lie with her. The CI then told MARIA to tell her sources that he would pay them "once I see what I'm getting." Id. at 5. MARIA said, "[t]hat's fair." Id.

Following that conversation, the CI called DAWN, and she reiterated what MARIA had said - that their cocaine sources did not want to meet with the CI and that they would not leave the cocaine with her without the money being paid first ("they not going to leave it with me without no cash," Tr. at 2). The CI indicated that he needed to see the cocaine that he was buying. He then

16

asked DAWN if she could vouch for the source. When she said that she could, the CI said that he was willing to meet with her source. DAWN then told the CI that her source could do "three [kilograms] today and two [kilograms] tomorrow" (July 10, 2001). Id. at 4. Not wanting to split the five kilograms into two separate deals, the CI asked DAWN to tell her source "to have all five together" so that he could buy them all at the same time, and that he would wait until Wednesday (July 11, 2001). DAWN asked the CI to call her on Wednesday morning. The CI then told DAWN to go ahead and set up the deal, and she said that she would. When she asked the CI what time he wanted to do the deal on July 11th, the CI said six o'clock. DAWN responded that that time was acceptable.

The day before the deal (July 10, 2001), JAMES called CI2 and left a message on his answering machine. In that message, JAMES stated that he had "them boys" on the line and that they could supply a "sample" (of cocaine) if that was what the CI wanted. JAMES further stated that they had all five kilograms of cocaine in their possession but that they did not want to distribute all five at once; they wanted to distribute three kilograms first, and if that exchange went smoothly, then they would distribute the other two kilograms forty-five minutes after the first exchange. JAMES asked CI2 to call him back "for tomorrow."

The next day, July 11, 2001, the CI talked to JAMES on the telephone. JAMES told the CI that their source had all five

17

kilograms of cocaine at that time. They agreed to do the deal at six o'clock, as DAWN had previously agreed to. When the CI asked where the deal would be conducted, JAMES told him to call back at five o'clock, adding, "I'll have everything set up and where." Tr. at 3.

C.    The Drug Deal

At approximately 5:00 p.m. on July 11, 2001, the CI called the JACKSONS' residence and spoke to MARIA. MARIA indicated that the deal would take place at six o'clock at the comedy club.

The CI drove to the comedy club at the appointed time and met with JAMES. MARIA and DAWN were not present. The CI asked JAMES if his cocaine source was alright. JAMES responded that he had known him for many years and that he was "cool" (trustworthy).

While they were waiting for the cocaine source to arrive, JAMES called DAWN and then handed the telephone to the CI. The CI told DAWN that he would give the "change" (the money to be laundered, as they had previously discussed) to JAMES after the deal. The CI asked DAWN if they were still on the ninety-day plan, and she indicated that they were.

After that telephone conversation, the CI continued to wait with JAMES for the cocaine source. While they were waiting, JAMES had a telephone conversation with another person. When JAMES got off the phone, he told the CI that his guys then had four kilograms of cocaine, that they were going to get the fifth kilogram, and

18

that they would be ready to do business by eight o'clock. JAMES advised the CI to come back at that time, but to call him first on his cellular telephone at about 7:45 p.m. The CI then left the comedy club.

At approximately 7:50 p.m., the CI called JAMES, as directed, and JAMES told him that his source was on the way. The CI then returned to the comedy club and met up with JAMES. Shortly thereafter, co-defendant Reginald Fletcher arrived. JAMES introduced Fletcher to the CI. Fletcher did not have the cocaine with him at that time, however. After having a conversation on his cell phone, Fletcher went to pick up the cocaine from another location. As Fletcher was leaving, JAMES said to Fletcher, "hit me when you are coming up the street."

When Fletcher left, JAMES told the CI that Fletcher had gone to pick up the cocaine. JAMES stated that Fletcher was a good guy and reliable. He further stated that after the five-kilogram deal was completed successfully, it would be no problem for the CI to get twenty kilograms or more.

Meanwhile, law enforcement agents who were conducting surveillance followed Fletcher from the comedy club to the parking lot of an Outback Steakhouse restaurant in Calumet City, Illinois. Shortly after Fletcher parked in the lot of the Outback Steakhouse, co-defendant Christopher Trammell arrived in another vehicle, and parked near Fletcher's vehicle. Trammell then provided Fletcher

19

with a bag containing five kilograms of cocaine.

Fletcher drove back to the comedy club with the cocaine. On the way there, he had a telephone conversation with JAMES, during which he told JAMES that he had the cocaine and that he was on his way. JAMES relayed that information to the CI.

When Fletcher subsequently arrived at the comedy club, he went into the building with JAMES and the CI, and displayed the cocaine. After observing the cocaine, the CI indicated that it looked good and that he was going to his vehicle to call for the money to be brought to the club. The CI then exited the building, got into his vehicle, and called a DEA agent to report that he had seen the cocaine. Agents then entered the building and arrested JAMES and Fletcher. The agents found the cocaine sitting on a counter in one of the bathrooms.

Following the arrests, Fletcher agreed to cooperate with the government. Under the supervision of agents, Fletcher called Trammell to arrange a meeting to deliver the money for the cocaine. Trammell instructed Fletcher to come to a residence in Chicago. Trammell was subsequently arrested at that location.

Prior to Trammell's arrest, while Fletcher was in the custody of the agents, MARIA called Fletcher's cell phone, apparently to check on the status of the drug deal. MARIA was unaware that Fletcher and JAMES had been arrested. Fletcher told MARIA that they were "still taking care of business."

20

D.    The Defendants' Post-Arrest Statements

In a post-arrest statement, JAMES stated that he had called Fletcher the day before the deal to try to hook up a cocaine source. JAMES further stated that he expected to earn $1,000 from the five-kilogram deal with the CI.

MARIA and DAWN, who were not arrested at that time, were interviewed by agents later that night. They were interviewed at MARIA's residence. When asked about her knowledge of the cocaine deal, MARIA admitted that she had spoken to the CI on the day of the deal to negotiate the deal. She further admitted that she had discussed the deal with JAMES, and that JAMES, the CI, and CI2 were all supposed to meet at the comedy club to do the deal. MARIA stated that JAMES was supposed to get some money from the CI and meet the drug supplier. According to MARIA, JAMES called Fletcher, who in turn called somebody else for the cocaine.

After interviewing MARIA, agents also interviewed DAWN at MARIA's residence. During this interview, DAWN stated, among other things, that about one-and-a-half to two months ago, she contacted an acquaintance named Vince and told him that she had heard a rumor that "he was supposed to be the man" (meaning a source of drugs) and that she had somebody who was looking for "that," referring to a drug customer. According to DAWN, Vince then said something to the effect of, "no, I don't do that." DAWN further stated that she was asking Vince on behalf of a friend of hers (namely, CI2), who

21

knew somebody else who wanted the drugs.[4]

The day after these interviews, on July 12, 2001, JAMES voluntarily met with DEA agents and provided additional information about the events leading up to his arrest. JAMES stated that he and DAWN both knew CI2 for many years. JAMES further stated that CI2 knew that Fletcher was in the drug business for a long time and that CI2 had asked JAMES how to get in touch with Fletcher. JAMES said that he did not tell CI2 how to get in touch with Fletcher. According to JAMES, CI2 had said that he would give JAMES $1,000 if he would ask around and hook up CI2 with a cocaine source. JAMES stated that CI2 had also told him that the CI was looking to buy a hundred kilograms of cocaine, but that the CI would settle for ten kilograms. JAMES stated that he then asked an individual about supplying some cocaine and that that individual told JAMES that he knew a source who could come up with two or three kilograms of cocaine, but not five or ten kilograms. JAMES said that he told

---

[4] DAWN appears to have been describing part of her efforts to find a drug source for the CI, whom she met through CI2. If, on the other hand, DAWN was actually referring to a different drug transaction that she was trying to arrange on a prior occasion, this evidence is nonetheless admissible pursuant to Rule 404(b) for purposes of establishing her intent, knowledge, and plan to commit the drug offenses charged in this case. See, e.g., United States v. Green, 258 F.3d 683, 694 (7th Cir. 2001) ("we have held on numerous occasions that when a defendant is charged with a specific intent crime (here, conspiracy to distribute cocaine), evidence of the defendant's prior drug transactions may be relevant to show knowledge and intent - purposes distinct from simply showing the defendant's propensity for drug dealing"). This evidence is also relevant to any entrapment defense that DAWN may assert at trial.

CI2 that he had asked two or three different people about the cocaine but that they were skeptical because of the amount requested. JAMES recalled that he told CI2 something to the effect of "your man is the police" and CI2 denied it. JAMES admitted that, on the day of the deal described above, he told the CI to meet him at the comedy club and that he also told the CI that he had checked with two or three street guys about the cocaine. JAMES stated that he selected the comedy club as the location for the drug deal because he was going to introduce the CI to Fletcher and did not want to do it at his house. JAMES further stated that when Fletcher came to the comedy club with the cocaine, JAMES suggested going into the club. He also stated that after they entered, he locked the doors behind them.

E.   Attempted Obstruction

In November 2001, after JAMES, MARIA, and DAWN had been indicted, JAMES threatened CI2. Specifically, on November 2, 2001, when CI2 arrived home from work, he saw JAMES talking with CI2's father and brother. JAMES told them that he had tapes, which he had received from his attorney, demonstrating that CI2 and the CI had cooperated with the government against him. JAMES also told them that "something was going to happen to [CI2]." Upon seeing JAMES talking to his brother and father, CI2 went into the house without saying anything to them. A short time later, CI2's father entered the house and told CI2 that JAMES was telling them that CI2

23

had set him up and that JAMES had described how he had been arrested because of CI2. At that point, CI2 went outside and told JAMES to leave. JAMES responded, "you gonna get yours."

CI2 also learned from other people in the neighborhood that JAMES had been making statements that there was a $200,000 contract on CI2's life.

Based on these allegations, the government moved to revoke JAMES' bond. This Court conducted an evidentiary hearing, during which it heard testimony from CI2 and JAMES. At the conclusion of the hearing, the Court found that JAMES had in fact threatened CI2 and thereby was tampering with a potential witness. The Court then revoked JAMES' bond.

24

### III. CONCLUSION

The foregoing proffer establishes, by a preponderance of the evidence, that: (1) defendants JAMES JACKSON, MARIA JACKSON, and DAWN JACKSON were members of a conspiracy to distribute and possess with intent to distribute cocaine; and (2) the co-conspirator statements summarized above were made during the course, and in furtherance of, the conspiracy. Therefore, the government respectfully requests that the Court conditionally admit into evidence the co-conspirator statements summarized above.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _Brian R. Havey_
BRIAN R. HAVEY
GABRIEL A. FUENTES
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300