UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 01 CR 634-5 |
| v. | ) | |
| | ) | Judge Charles R. Norgle, Sr. |
| DAWN JACKSON | ) | |

DOCKETED JAN 2 3 2003

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, DAWN JACKSON, and her attorney, PAUL BRAYMAN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(e)(1)(C), as more fully set forth in paragraph 16 below.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and the defendant regarding the defendant's criminal liability in case no. 01 CR 634-5.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand, or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities except as expressly set forth in this Agreement.

96

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, DAWN JACKSON, and her attorney, PAUL BRAYMAN, have agreed upon the following:

1. Defendant acknowledges that she has been charged in the indictment in this case with conspiracy to distribute and possess with intent to distribute cocaine, in violation of Title 21, United States Code, Section 846, and with possession with intent to distribute cocaine, in violation of Title 21, United States Code, Section 841(a)(1).

2. Defendant has read the charges against her contained in the indictment and those charges have been fully explained to her by her attorney.

3. Defendant fully understands the nature and elements of the crimes with which she has been charged.

4. Defendant will enter a voluntary plea of guilty to Count One of the indictment in this case.

5. Defendant will plead guilty because she is in fact guilty of the charge contained in Count One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish her guilt beyond a reasonable doubt. The following is only a summary of facts and is not intended to be a detailed account of everything that defendant knows about the individuals and events described below:

As charged in Count One of the indictment, defendant conspired with co-defendants James Jackson (her brother), Maria Jackson (her sister-in-law), and with Reginald Fletcher

and Christopher Trammell to distribute five kilograms of cocaine to an individual who, unbeknownst to them, was cooperating with the government ("the CI"). The CI negotiated to purchase the cocaine from the Jacksons during June and July 2001.

The CI was first introduced to co-defendant Maria Jackson on June 18, 2001 by a mutual friend ("CI2"). This meeting took place at Maria Jackson's residence in South Holland, Illinois. During this meeting, the CI asked Maria Jackson if she was in a position to connect him with someone who could supply some cocaine, and she indicated that she was. Maria Jackson said that she had a source who would be able to supply cocaine at a price of $15,000 per kilogram. The CI and Maria Jackson agreed to continue this discussion at a later date.

Subsequently, the CI arranged to meet with Maria Jackson and defendant to discuss a drug trafficking venture. The meeting was scheduled for June 28, 2001, at the TNT Comedy Club, 2352 172nd Street, Lansing, Illinois, which was owned by defendant. The CI met with defendant as planned, but Maria Jackson did not arrive for the meeting. During this meeting with defendant, the CI asked her if CI2 had talked to her about the CI's interest in purchasing some cocaine. Defendant said no, but that Maria Jackson had talked to her about it. Defendant went on to state that she knew an individual who had an unlimited supply of cocaine and that such individual could supply the CI with as much cocaine as the CI needed. Defendant further stated that she was going to meet with this individual later in the day and that the CI should call her back later.

3

Later that day, the CI called defendant as instructed, but she had not yet met with the cocaine source. Defendant stated that she would call the CI after she had talked to that individual.

The CI subsequently arranged to meet with defendant in the parking lot of a supermarket in South Holland to discuss the matter further. Maria Jackson came to the meeting with defendant. During the meeting, defendant and Maria Jackson told the CI that they had spoken with several different cocaine sources who were all hesitant about selling cocaine to the CI because they did not know him. Defendant and Maria Jackson further stated they would still attempt to find a cocaine source for the CI. At one point during this conversation, the CI asked defendant and Maria Jackson if they could launder several hundred thousands in drug money for him. Defendant and Maria Jackson indicated that they could, describing different ways of laundering the money, such as by running the money through the TNT Comedy Club, arranging concerts at other facilities, or conducting real estate transactions. They told the CI that it would take ninety days to launder $300,000.

Three days later, on July 5, 2001, the CI called defendant to see if she had made any progress in locating a cocaine source who was willing to deal with him. Defendant stated that the people whom she had talked to were still asking questions about the CI and were hesitant about dealing with him. The CI asked defendant to tell them that he wanted to buy five kilograms of cocaine to start with. He said that he would check back with her the following week.

On July 7, 2001, the CI had a telephone conversation with Maria Jackson, during which she indicated that they had located a source who had five kilograms of cocaine to sell, at a price of $20,000 per kilogram. The CI responded that that price was acceptable and that she should go ahead set up a deal.

By July 9, 2001, the deal still had not been arranged. The CI talked to Maria Jackson again on the telephone, and she again indicated that her sources were hesitant to meet with the CI. The CI told Maria Jackson that he had to be present if there was going to be a deal. Maria Jackson then suggested that they give him a sample of the cocaine first, so that he would know that they could be trusted. The CI rejected that idea, telling Maria Jackson that he needed to be directly involved in the drug deal. Maria Jackson tried to assure the CI that the problem wasn't with her, but with her cocaine sources.

Following that conversation, the CI called defendant, and she reiterated what Maria Jackson had said – that their cocaine sources did not want to meet with the CI and that they would not leave the cocaine with her without the money being paid first. The CI responded that he needed to be there, at the deal, to see the cocaine that he was buying. Defendant told the CI that she wouldn't be there for the deal itself but that she would be able to hook him up with her cocaine source. She further stated that the cocaine source could distribute three kilograms that day and then distribute the rest the next day (July 10, 2001) if all went well with the first exchange. When the CI asked if he could get all five kilograms at once if he waited until July 11, 2001, defendant said yes. Defendant told the CI said that they could do

the deal at her place or at another location. She asked the CI to call her on Wednesday morning (July 11, 2001). She then asked the CI what time he wanted to do the deal on July 11th, and the CI said six o'clock. Defendant said that would be fine.

The day before the deal, July 10, 2001, co-defendant James Jackson called CI2 and left a voicemail message for him. In that message, James Jackson stated that he had "them boys" on the line and that they could supply a sample (of cocaine) if that was what the CI wanted. James Jackson went on to state that they had all five kilograms of cocaine in their possession but that they did not want to distribute all five kilograms at once; they wanted to distribute three kilograms first, and if that exchange went smoothly, then they would distribute the other two kilograms within forty-five minutes of the first exchange. James Jackson asked CI2 to get back to him "for tomorrow."

The next day, July 11, 2001, the CI called the residence of Maria and James Jackson, and James Jackson answered the telephone. In the ensuing conversation, James Jackson indicated that his cocaine source had all five kilograms of cocaine. James Jackson asked the CI to call him back at 5:00 p.m., when he would let the CI know where the deal was going to take place.

At approximately 5:00 p.m., the CI called the Jacksons' residence again. This time, Maria Jackson answered the phone. Maria Jackson told the CI to meet her and James Jackson at the TNT Comedy Club at six o'clock.

When the CI arrived at the comedy club, he met with James Jackson. Maria Jackson

6

was not present. James Jackson told the CI that he did not have all of the cocaine at that time and that he was expecting it to be delivered by 8:00 p.m. The CI then went home.

Shortly after eight o'clock, the CI returned to the comedy club and met with James Jackson and co-defendant Reginald Fletcher. At one point during this meeting, Fletcher left the comedy club to pick up the cocaine from another individual, co-defendant Christopher Trammell. Fletcher drove from the comedy club to the parking lot of a restaurant, namely, the Outback Steakhouse, on 159th Street in Calumet City, Illinois. Shortly after Fletcher parked in the lot of the Outback Steakhouse, Trammell arrived in another vehicle, and parked near Fletcher's vehicle. Trammell then provided Fletcher with a bag containing approximately five kilograms of cocaine.

Fletcher drove back to the comedy club with the cocaine. Fletcher carried the cocaine into the building and displayed the cocaine to James Jackson and the CI. After observing the cocaine, the CI exited the building and notified law enforcement agents who were conducting surveillance. James Jackson and Fletcher were then placed under arrest.

6. For purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

(a) The parties agree that the Court shall apply the Sentencing Guidelines in effect as of November 1, 2002.

(b) The parties further agree that the amount of cocaine involved in the

7

offense is five kilograms and, therefore, the base offense level is 32 under Guideline §§ 2D1.1(a)(3) and (c)(4).

(c) The parties further agree that defendant was a minor participant in the offense and, therefore, the base offense level should be reduced by two levels under Guideline § 3B1.2(b).

(d) If the Court agrees that defendant qualifies for a mitigating role adjustment under Guideline § 3B1.2(b), the base offense level shall be not more than 30 under Guideline § 2D1.1(a)(3).

(e) If the Court also finds that defendant meets the criteria set forth in subdivisions (1)-(5) of subsection (a) of Guideline § 5C1.2, the Court shall impose a sentence in accordance with the applicable sentencing guidelines without regard to any statutory minimum sentence and shall decrease the offense level by two levels pursuant to Guideline § 2D1.1(b)(6). The parties agree that defendant has satisfied the criteria set forth in subdivisions (1)-(5) of subsection (a) of Guideline § 5C1.2.

(f) The parties further agree that defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for her criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for her actions, within the meaning of Guideline § 3E1.1(a), a two-level reduction in the offense level will be appropriate.

(g) The parties further agree that defendant has timely provided complete

information to the government concerning her own involvement in the offense, within the meaning of Guideline § 3E1.1(b). Therefore, an additional one-level reduction in the offense level is appropriate, provided that the Court determines the offense level to be 16 or greater prior to the operation of Guideline § 3E1.1(a).

    (h)    Based on the facts known to the government, defendant's criminal history category is I.

    (i)    Defendant and her attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final sentencing guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the Probation Officer's or the Court's concurrence with the above calculations.

7.    Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the Probation Office and/or the Court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw her plea on the basis of such corrections.

8.    Defendant understands that the charge to which she will plead guilty carries a

9

statutory mandatory minimum term of imprisonment of ten years (if applicable), a maximum term of imprisonment of life, and a maximum fine of $4,000,000. Defendant understands that this charge also carries a term of supervised release of at least five years and up to any number of years, including life, which the Court may specify.

9. Defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, she will be assessed $100 on the charge to which she has pleaded guilty, in addition to any other penalty imposed. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order made payable to "Clerk, U.S. District Court."

10. Defendant understands that by pleading guilty she surrenders certain rights, including the following:

(a) If defendant persisted in a plea of not guilty to the charges against her, she would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b) If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and her attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other

disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict her unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately.

(c) If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d) At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and her attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in her own behalf. If the witnesses for defendant would not appear voluntarily, she could require their attendance through the subpoena power of the Court.

(e) At a trial, defendant would have a privilege against self-incrimination so that she could decline to testify, and no inference of guilt could be drawn from her refusal to testify. If defendant desired to do so, she could testify in her own behalf.

11. Defendant understands that by pleading guilty she is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to her, and the

11

consequences of her waiver of those rights. Defendant further understands that she is waiving all appellate issues that might have been available if she had exercised her right to trial.

12. Defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal any sentence that is in accord with paragraph 16 below (or the manner in which that sentence was determined). Defendant also waives her right to challenge her sentence or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

13. Defendant agrees that she will fully and truthfully cooperate with the government in any matter in which she is called upon to cooperate. More specifically, defendant agrees to provide complete and truthful information in any investigation and pretrial preparation, and complete and truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding, and any related civil administrative or court proceeding.

14. Defendant understands that the indictment and this Plea Agreement are matters of public record and may be disclosed to any party.

15. Defendant understands that the United States Attorney's Office will fully

apprise the Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against her, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

16. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation and, assuming defendant's full and truthful cooperation, shall move the Court, pursuant to Guideline § 5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable guideline range and the statutory mandatory minimum sentence (if applicable), and to impose the specific sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guideline range and statutory mandatory minimum sentence rests solely with the Court. However, this Plea Agreement is governed, in part, by Federal Rule of Criminal Procedure 11(e)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons equal to two-thirds (2/3) of the low-end of the applicable sentencing guideline range or two-thirds (2/3) of the mandatory minimum sentence provided for under 21 U.S.C. § 841(b), if applicable, whichever is higher. Other than the agreed term of imprisonment, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of imprisonment set forth above, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(e)(2) and (4). If, however, the Court refuses to impose the agreed term of imprisonment set forth above, thereby rejecting the Plea

Agreement, or otherwise refuses to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

17. After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining count of the indictment as to this defendant.

18. Defendant understands that her compliance with each part of this Plea Agreement extends throughout and beyond the period of her sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. Defendant further understands that in the event she violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or to resentence defendant. Defendant understands and agrees that in the event that this Plea Agreement is breached by her, and the government elects to void the Plea Agreement and prosecute her, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against her in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

19. Defendant and her attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this

Agreement, to cause defendant to plead guilty.

20. Defendant agrees that this Plea Agreement shall be filed and become a part of the record in this case.

21. Defendant acknowledges that she has read this Agreement and carefully reviewed each provision with her attorney. Defendant further acknowledges that she understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: January 21, 2003

PATRICK J. FITZGERALD
United States Attorney

BRIAN R. HAVEY
Assistant United States Attorney

DAWN JACKSON
Defendant

PAUL BRAYMAN
Attorney for Defendant

15